OPINION
Defendant, Michael Miller, appeals from his conviction and sentence on two counts of gross sexual imposition.
In the summer of 1998, Nancy W. and her children moved into a house across the street from Larch Tree Golf Course in Trotwood. Nancy's two sons, Terence W., age eleven, and Anton W., age nine, became interested in working at the golf course. On Friday, August 21, 1998, Nancy W. took her sons to the golf course. Kent Bobo, the manager of golf operations, told the boys that they were too young to work there, and that the policy of the course was to hire only persons who were sixteen and older. Bobo encouraged the boys to return after they reached age sixteen.
While Nancy W.'s sons were talking to Kent Bobo, Defendant, Michael Miller, introduced himself. Miller told Nancy W. that he was a school teacher who worked part time at the golf course, and that he had gotten jobs for some of his students there. When Nancy W.'s sons reported that Mr. Bobo had said they were too young to work there, Miller told Nancy W. that he could find work for the boys if they would "volunteer" on the days he worked, Sundays and Mondays. Miller did not have permission from Kent Bobo to make such an arrangement. The two boys were excited about Miller's offer, and Nancy W. agreed to let her sons work with Miller.
On Sunday afternoon, August 23, 1998, Nancy W. dropped her sons off at the golf course. Miller first had the boys fill buckets with golf balls. Next, he had them wash golf carts. Miller told the two boys to remove their shirts before washing the golf carts, though the dress code did not permit employees or patrons to remove their shirts. After the boys finished washing the golf carts, Miller began playing and roughhousing with the boys.
Miller grabbed Anton W. by the ankles, held him upside down, and swung him around. Then Miller decided to play a "spanking game" with the boys. Miller grabbed each of the boys, one at a time, laid them across his lap and playfully spanked them. Terence was uncomfortable with Miller's behavior.
Miller and the two boys later went inside the pro shop, where Miller continued his boisterous behavior with the boys behind the counter. Miller allowed the two boys to play with the buttons on the cash register and the computer, and the boys spent time sitting on Miller's lap that afternoon. Terence was concerned about all of Miller's horseplay because his mother had warned him he was going there to work, not to play or "goof around." When Terence and Anton W. walked home later that afternoon, Anton was excited about his job and anxious to return the next day. However, Terence the older of the brothers, did not want to return.
The following day, Monday August 24, 2998, the two boys returned to work at the golf course in the afternoon. Once again, Miller had the boys put golf balls into baskets. Miller also played with the boys behind the counter, letting them push the buttons on the cash register and the computer. Both Terence and Anton spent time sitting on Miller's lap that afternoon. At times, Miller bounced the boys up and down on his lap. At other times, Miller pulled the boys close to him while they sat on his lap. Miller also grabbed Terence W. and held him upside down by the ankles, as he had the previous day with Anton. This time Miller held Terence close to his body.
Just as he had the day before, Miller again played the "spanking game" with the boys. This time, Miller grabbed each of the boys one at a time, pulled their pants down partway, laid them across his lap, and gave them a "bare bottom spanking," while he sat on a stool in the pro shop. Terence believed Miller's behavior was wrong, but he was afraid to object. When Miller pulled Terence onto his lap and held him close to his body after the spanking, Terence felt Miller's penis becoming erect against his buttocks. Terence knew what an erect penis is, and he was confident that what he felt on his buttocks was Miller's erect penis and not keys, a pocketknife, or some other object in Miller's pants pockets.
Later that afternoon Nancy W. picked up her two sons and drove them to soccer practice. After they returned home that evening, Nancy W. asked her sons how their day at the golf course had gone. Terence was reluctant to discuss what had happened that day and went to his room. Anton told his mother that there wasn't much work for them to do and so they played games with Mr. Miller. When Nancy W. asked Anton what kind of games they played, Anton described how Miller had spanked them. Nancy W. then called Terence out of his room and insisted that Terence tell her what happened. When Terence began to tell his mother what had happened, he became upset and cried. Terence then ran back into his room and locked the door. After Nancy W. consoled Terence, he explained what had happened. Nancy W. then called the police.
On Thursday, August 27, 1998, Det. Culbertson from the Trotwood police department and Terri Brown, a victim-witness advocate from the prosecutor's office, interviewed Terence W. and Anton W. separately. Later that day, Det. Culbertson interviewed Michael Miller at the police station. Miller admitted that he had pulled the boys' pants down and spanked their bare buttocks, but he claimed it was all innocent horseplay and roughhousing with no sexual intent. When Det. Culbertson asked Miller to write out a statement, Miller asked for an attorney, whereupon the interview was terminated. Det. Culbertson immediately arrested Miller.
Michael Miller was indicted on two counts of gross sexual imposition involving a child under thirteen years of age in violation of R.C.2907.05(A)(4). Following a jury trial, Miller was found guilty on both counts. The trial court sentenced Miller to two consecutive three year terms of imprisonment.
From his conviction and sentence Miller has timely appealed to this court.
 FIRST ASSIGNMENT OF ERROR THE TRIAL COURT COMMITTED AN ABUSE OF DISCRETION WHEN IT ALLOWED CERTAIN REBUTTAL WITNESSES TO TESTIFY OVER DEFENSE OBJECTION.
Miller argues that testimony given by States' witnesses Terri Brown and Terence W. was not proper rebuttal because it did not refute, disprove or challenge any new evidence first offered by the defense in this case. We disagree.
During the State's case-in-chief, Det. Culbertson testified concerning his interview of the two victims, Terence W. and Anton W. According to Culbertson, Terence W. stated that while he was sitting on Miller's lap he felt "it" on his bottom. When Terri Brown asked Terence W. if by "it" he meant Miller's penis, Terence said yes.
During the defense case, Dr. Melvin Guyer, a professor of psychology and psychiatry at the University of Michigan, testified as an expert witness regarding how children who are alleged victims of sexual abuse can be influenced to remember things that did not actually happen through suggestive questions and improper interview techniques. In response to a hypothetical question based upon Det. Culbertson's earlier testimony, Dr. Guyer indicated that the questions Terri Brown and Det. Culbertson had asked Terence W. were improper because they were leading and suggested the answer, in effect telling Terence W. what it was that he felt against his bottom while sitting on Miller's lap.
On rebuttal, the State presented Terri Brown, who testified, over Miller's objection, that when Terence W. stated during the police interview that he felt "it" on his bottom she did not, as Culbertson had testified, ask Terence if by "it" he meant Miller's penis. Rather, Brown simply asked Terence what "it" meant; that is, an ear, a nose, an elbow. It was Terence who said "it" meant Miller's penis becoming erect.
The State also recalled Terence W. as a witness on rebuttal. He testified, over Miller's objection, concerning what he had said when Det. Culbertson interviewed him, and the fact that he, not Terri Brown or Culbertson, first said that it was Miller's penis becoming erect that he felt against his bottom while sitting on Miller's lap.
Generally, evidence which does not refute or contradict evidence first presented by the opposing party is not proper rebuttal evidence. Statev. McNeill (1998), 83 Ohio St.3d 438, 446; State v. Hawn (June 30, 2000),Montgomery App. No. 17722, unreported. A trial court's decision as towhether evidence is proper rebuttal, and therefore admissible, is amatter resting within the court's sound discretion, and its decision insuch matters will not be reversed on appeal absent an abuse ofdiscretion. McNeill, supra; State v. Finnerty (1989), 45 Ohio St.3d 104,108. An abuse of discretion connotes more than a mere error of law or anerror in judgment. It implies an arbitrary, unreasonable, unconscionableattitude on the part of the trial court. State v. Adams (1980),62 Ohio St.2d 151.
The principal facts in this case are not in dispute. Miller concedes that he held the two boys on his lap and that he pulled their pants down and spanked their bare buttocks. The critical issue is whether Miller's conduct constituted "sexual contact," which is a necessary element of the offense of gross sexual imposition, R.C.2907.05 (A)(4), with which Miller was charged. "Sexual contact" is defined by R.C. 2907.01(B) to mean "any touching of an erogenous zone of another, including the . . . buttock(s) . . . the for purpose of sexually arousing or gratifying either person."
Terence W. testified that while he was sitting on Miller's lap after the spanking he felt Miller's penis becoming erect. That is evidence from which a jury could reasonably find that Miller's purpose in spanking these young boys as he did was to sexually arouse or gratify himself. Miller denied any sexual purpose or intent, and further denied that his penis had become erect. Miller claimed that his conduct was nothing more than innocent horseplay, and that what Terence felt while sitting on Miller's lap was a pocketknife Miller carried in his pocket.
The defense first suggested that through the testimony of their expert witness, Dr. Guyer, Det. Culbertson and Terri Brown had improperly influenced Terence W. to remember something that did not actually happen, in effect informing Terence that what it was he felt while sitting on Miller's lap was Miller's erect penis. The testimony offered by Terri Brown and Terence W. clearly contradicted that implication, which was first raised by the defense in its own case. Therefore, the testimony by Brown and Terence W. was proper rebuttal evidence. The trial court did not abuse its discretion in admitting that evidence.
The first assignment of error is overruled.
 SECOND ASSIGNMENT OF ERROR THE TRIAL COURT VIOLATED APPELLANT'S CONSTITUTIONAL RIGHT TO A FAIR TRIAL WHEN IT FAILED TO CONDUCT AN ADEQUATE INQUIRY INTO ALLEGED JURY MISCONDUCT.
At one point in the trial, during a sidebar conference, the prosecutor called Miller a "pervert." At that moment the jury laughed, raising concerns on the part of the defense that the jurors may have overheard the prosecutor's comment and been tainted by it. Miller objected and moved for a mistrial.
In overruling Miller's objection the trial judge first noted that while she was at sidebar she barely heard the comment. Further, the trial judge questioned her court reporter, who at the time the comment was made had been talking to the jury. The trial court observed that the jury was listening to the court reporter at the time and not the sidebar conference. The court reporter indicated to the trial judge that she personally did not hear the prosecutor's comment. Lastly, the court noted that there was a plausible explanation for why the jury laughed when they did that was unrelated to the prosecutor's comment. At the time the comment was made, the court reporter was joking with the jurors about their uncomfortable chairs and they had laughed about that. The timing of their laughter was simply a coincidence.
When possible jury misconduct is brought to the attention of the trial judge, the court has a duty to investigate the matter. State v. Rudge(1998), 89 Ohio App.3d 429, 442. Because the trial judge is in the bestposition to determine the nature and extent of alleged jury misconduct,the court's decision on the scope of the proceedings necessary todiscover misconduct in each case is reviewed only for an abuse ofdiscretion. United States v. Shackleford (1985), 777 F.2d 1141, 1145.
In State v. Hopfer (1996), 112 Ohio App.3d 521, 543, this court observed:
 In reviewing circumstances suggesting juror misconduct, we must employ a two-tier analysis: (1) determine whether there was juror misconduct and (2) if juror misconduct is found, determine whether it materially affected the defendant's substantial rights. See State v. Taylor (1991), 73 Ohio App.3d 827, 833, 598 N.E.2d 818, 821.
 One form of juror misconduct is bias or prejudice, that is, a refusal to consider the evidence or a forming of an opinion of guilt or innocence before all of the evidence is presented. Id at 831, 598 N.E.2d at 820. This court has set forth a test to determine whether a juror's bias amounts to misconduct.
 "The test for a prospective juror is not whether he has escaped normal influences or has no views on a universal question; the test is whether his views will impair his judgment to the extent that he would not be able to faithfully and impartially determine the facts and apply the law according to the instructions of the court." Dayton v. Gigandet (1992), 83 Ohio App.3d 886, 891-892, 615 N.E.2d 1131, 1134.
The trial court did investigate the potential jury misconduct, but Miller now argues on appeal that the court was obligated to investigate the matter more thoroughly than it did, and to voir dire the individual jurors on whether they had overheard the prosecutor's comment. We disagree. Miller did not request that the trial court voir dire the members of the jury. Thus, Miller has waived any error in that regard. Moreover, the trial court's own investigation failed to reveal or suggest anything which demonstrates that the jurors overheard the prosecutor's comment, much less that they were tainted by the comment to such an extent they could no longer fairly and impartially decide the question of Miller's guilt based solely upon the evidence presented. No juror misconduct has been demonstrated, and the trial court did not abuse its discretion in failing to voir dire the jurors on the matter as such an examination was not warranted.
The second assignment of error is overruled.
 THIRD ASSIGNMENT OF ERROR THE PROSECUTION COMMITTED MISCONDUCT TO THE EXTENT THAT IT DENIED APPELLANT A FAIR TRIAL, AS GUARANTEED BY THE DUE PROCESS CLAUSES OF THE FOURTEENTH AMENDMENT OF THE UNITED STATES CONSTITUTION, AND ARTICLE I, SECTION TEN OF THE OHIO CONSTITUTION.
Miller contends that he was deprived of a fair trial by prosecutorial misconduct in the form of several improper remarks made by the prosecutor during he closing argument.
Miller's objections to several of the remarks made by the prosecutor during summation were overruled by the trial court. Still other remarks Miller did not object to. The State strongly urges this court to find that Miller's failure to object waived any error in the prosecutor's remarks.
Given the outrageous nature of some of the prosecutor's inflammatory remarks, and in reviewing those remarks in the context of the prosecutor's closing argument as a whole, we are not inclined to ignore such serious prosecutorial misconduct on a waiver theory. State v.Kennan (1993), 66 Ohio St.3d 402. Once Miller's objections to obviously improper remarks by the prosecutor were overruled by the trial court, Miller may have justifiably concluded that further objections were futile and would create a risk of annoying or alienating the members of the jury.
The test for prosecutorial misconduct is whether the prosecuted remarks were improper and, if so, whether they prejudiced the substantial rights of the accused; that is, deprived him of a fair trial. State v. Lott(1990), 51 Ohio St.3d 160; State v. Apanovitch (1987), 33 Ohio St.3d 19.The focus of that analysis is on the fairness of the trial, not theculpability of the prosecutor. Lott, supra. If the improper remarksdeprived defendant of a fair trial, then prejudice has resulted from themisconduct and reversal is warranted. State v. Maurer (1984),15 Ohio St.3d 239; State v. Stimes (April 11, 1989), Montgomery App. No. 10985, unreported.
In State v. Furlow (August 29, 1989), Montgomery App. No. 11140, unreported, this court observed.
 The first duty of a prosecutor is to serve the system of justice and the court. The duty to "win" is secondary. The prosecutor's goal is a fair trial. As a lawyer, the prosecutor may not "state or allude to any matter that he has no reasonable basis to believe is relevant to the case or that will not be supported by admissible evidence" and may not "intentionally or habitually violate any established rule of procedure or evidence".
Both the prosecution and the defense are entitled to some latitude in summation. Lott, supra. Some of the prosecutor's remarks about which Miller complains clearly fall within that customary latitude, and thus are not improper and do not constitute misconduct.
Miller complains that the prosecutor accused the defense of dragging his trial out in order to diminish the jury's recollection of the testimony one week earlier by the two child victims. Attacks on trial counsel, which is what this amounts to, are unprofessional. Nevertheless, this comment upon what the State perceived the defense strategy to be falls within that wide latitude normally afforded counsel in summation. State v. Stephens (1970), 24 Ohio St.2d 76. Its purpose may have been to refocus the jury's attention on the testimony of the victims.
Miller also complains that the prosecutor engaged in name calling, referring to defendant's expert witness who was from Michigan as "Mr. Michigan." Such remarks, though embarrassing and juvenile, are nevertheless relatively innocuous. Also, the prosecutor referred to Defendant Miller as "Mr. Top of the Class" and "Mr. Multi-Degrees." Those epithets have the same tone. According to the State, however, those remarks were intended to cast doubt upon Miller's credibility by contrasting his intelligence level with the believability of his claim that he was not aware that the golf course where he had worked for the past two summers had a policy of not hiring persons under age sixteen and not allowing anyone except employees behind the counter in the pro shop. Such comments upon the credibility of Miller's trial testimony, while perhaps shrill, nevertheless are confined to the evidence presented and as such are not improper.
Additionally, Miller complains about the prosecutor's comment faulting him for not producing evidence to support his claim that children under the age of sixteen were permitted to work at the golf course on occasion. We see nothing improper in arguing to the jury that defendant failed to produce evidence to support his theory of the case. This was a fair comment upon the weight of the evidence presented.
Miller also complains because the prosecutor characterized as a "distraction" and "trial strategy" Miller's claim that what Terence felt pressing against his buttocks was a pocketknife in Miller's pocket and not Miller's erect penis. Given Terence W.'s testimony at trial that he was certain about what it was he had felt, this remark was a fair comment upon the evidence presented and not improper.
Unfortunately, several of the other remarks made by the prosecutor during closing argument were improper, inflammatory, and prejudicial to Miller's rights to a fair trial. The prosecutor's persistent use of such remarks during closing argument amounts to serious unethical misconduct.[1] In Furlow, this court gave fair warningto the same prosecutor that prosecutorial misconduct can be referred bycourts to the Disciplinary Counsel's Office of the Ohio Supreme Court.State v. DePew (1988), 38 Ohio St.3d 275.
The prosecutor stated in her closing argument that during jury selection the defense had removed any potential jurors who have children. The prosecutor also urged jurors during summation to "not let defendant get away with this," and to "show these kids that the jury system works." These statements invited the jury to convict Miller based upon considerations extraneous to guilt or innocence rather than upon the evidence presented at trial. Making reference to matters clearly outside the evidence and appealing to the jury's emotion is obviously improper. Sadly, the remarks by this prosecutor during closing argument went from improper to outlandish.
In an effort to discredit the testimony of the Defendant's expert witness, Dr. Guyer, who had opined that the two boys may have been influenced by investigators, the prosecutor told the jury: "don't let Mr. Michigan twist that around. He gets paid to testify that the sexual abuse didn't occur. That's what he's paid for. That's prostitution in any book." (T. 1139). The Defendant's objection was overruled by the court. On appeal, the State argues that the comment was fair because the witness involved testifies only on behalf of persons accused of sexual misconduct. On that basis, one might make the same charge against police officers, victim/witness advocates, hospital personnel, and others who testify only on behalf of the State in such cases.
We emphatically do not agree that the prosecutor's comment was fair. Calling a witness a prostitute because the witness testifies regularly on behalf of either the prosecution or the defense is a slander on the witness and the solemn oath he took to tell the truth. It impugns the integrity of the judicial process itself.
In State v. Fears (1999), 86 Ohio St.3d 329, 332, the Ohio Supreme Court condemned as improper a prosecutor's reference to defendant's expert witness as "defense counsel's mouthpiece." The Court stated:
 While we realize the importance of an attorney's zealously advocating his or her position, we cannot emphasize enough that prosecutors of this state must take their roles as officers of the court seriously. As such, prosecutors must be diligent in their efforts to stay within the boundaries of acceptable argument and must refrain from the desire to make outlandish remarks, misstate evidence, or confuse legal concepts.
The prosecutor's remark in Fears was far less inflammatory than the prosecutor's reference in this case to Defendant's expert witness as a prostitute. We can find no justification for the remark.
The prosecuting attorney also asked the jury to consider the Defendant's professional calling, that of a teacher, when deciding guilt or innocence. The prosecutor argued that the teaching profession and the priesthood "attract people who crave sex with children." (T. 1142). These comments were not the subject of an objection. However, there is no evidence in this record to support the prosecutor's suggestion that Miller entered the teaching profession in order to satisfy his desires as a pedophile. The prosecutor's reference to the priesthood is not only irrelevant but a slur.
The principal prosecutor's co-counsel argued the rebuttal. The record reflects that she made a clapping sound with her hands when she began her remarks, apparently with reference to what defense counsel had just said. (T. 1167). Defense counsel stated at oral argument that the prosecutor stood and made a slow and extravagant clapping sound with her hands which lasted for perhaps ten or fifteen seconds. If that did occur, it is conduct that is highly unprofessional and which has no place in a courtroom.
We cannot claim to know why the prosecuting attorney mounted these wild attacks. They may have been inspired by a "take no prisoners" attitude, one that puts winning above all else and completely disregards the fairness of the trial. That attitude has brought the legal profession into low repute. We cannot condone its application in these ways, if, indeed, that is what motivated the prosecutor here.
We are charged to reverse for prejudice, which we shall do here. It is most unfortunate that the prosecuting attorney's excesses will now compel a retrial of this case, exposing these victims again to the embarrassment that events of this kind involve.
As with most child sexual abuse cases, this case comes down to a credibility contest between the child victims and the Defendant, Michael Miller. There is sufficient evidence to convict, but that evidence is far from overwhelming. On the record before us, we cannot say beyond a reasonable doubt that the prosecutor's outlandish and inflammatory remarks during closing argument did not contribute to Miller's conviction. Accordingly, we must sustain the third assignment of error, reverse the judgment of the trial court, and remand this case for a new trial.
 ______________________ GRADY, P.J.
FAIN, J., and YOUNG, J., concur.
[1] The prosecutor's remark during a sidebar conference calling Miller a "pervert" was not made to the jury, and the jury apparently didn't hear it. However, its tone is in the same vein as the later statements the prosecutor made during her closing argument.